ROGERS *v.* STATE

No. 42221 January 15, 1962 136 So. 2d 331

*Roy J. Goss, Philip Singley,* Columbia, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., for appellee.

GILLESPIE, J.

This is an appeal from a judgment dismissing the petition of Basel Rogers for a writ of error coram nobis. The petition was heard before a disinterested judge, the Honorable Tom P. Brady, upon certification of the Honorable Sebe Dale, Circuit Judge of Marion County, that he was disqualified.

A brief history of this litigation is necessary to understand the issues. Sheriff J. V. Polk of Marion County was waylaid and murdered on April 22, 1960. Six persons, including Basel Rogers, appellant, were arrested and charged with murder. The Circuit Court of Marion County convened on June 13, 1960, and appellant and the others were promptly indicted, and on that day appellant entered a plea of guilty and was given a life sentence. On the afternoon of Saturday, July 2, 1960, appellant was brought before the Circuit Judge and permitted to withdraw his plea of guilty to murder and enter a plea of guilty to manslaughter, for which he was sentenced to a term of 17 years in the penitentiary. Court then adjourned. Appellant's brother employed an attorney the same day. On July 5, 1960, appellant filed a motion to be allowed to withdraw his guilty plea. This was overruled and appellant appealed to this Court, where the lower court was affirmed on the ground the motion was filed after court adjourned. Rogers v. State, 126 So. 2d 512. Appellant then sought relief by habeas

corpus and this was denied and it was pointed out that if any remedy was available to appellant, it was by petition for writ of error coram nobis. Rogers v. Jones, 128 So. 2d 547.

Appellant then filed in this Court an application under Section 1992.5, Code of 1942, for permission to file in the Circuit Court of Marion County a petition for writ of error coram nobis. This Court sustained the application. Rogers v. State, 130 So. 2d 856.

The petition involved on this appeal was then filed in the Circuit Court of Marion County, whereupon the Honorable Sebe Dale certified his disqualification and it was heard by the Honorable Tom P. Brady, who dismissed the petition. Appellant then perfected this appeal.

The petition and State's answer made up the issues which are the questions now before us for decision, as follows:

(1) Was the plea of guilty to the charge of murder the result of promises and persuasion on the part of the Circuit Judge?

(2) Did the appellant have the benefit of counsel as provided by Section 2505, Code of 1942?

The question here is not whether appellant is guilty of murder, but it is appropriate to state that the record clearly indicates that Hillary Thornhill was the principal instigator of the crime. Willie McCain was the actual killer. We are not called upon to decide whether the record is sufficient to sustain appellant's conviction, but the record indicates that appellant was on the fringe of the conspiracy. The Circuit Judge's own testimony indicates he thought appellant was "sucked" into the crime by Hillary Thornhill.

Since the trial judge denied the writ the facts must be stated in the light most favorable to the State. In order to give the State the full benefit of the fact that all conflicts in the testimony were resolved against

appellant, we decide the case on the testimony of Judge Dale, the testamony of Attorney Ben Rawls, and minor facts which are not in dispute. The testimony of Judge Dale alone is sufficient to require a reversal of the case and the granting of the writ.

Shortly after appellant was charged with murder, Mrs. Marvin Chance, appellant's sister, talked to Judge Dale at church, and Judge Dale told her to talk to the district attorney because he was not in a position to do so. Then Marvin Chance, appellant's brother-in-law, talked to him and Judge Dale told him to talk to the district attorney. Nevertheless, the brothers, sisters and brother-in-law of appellant continued to talk to Judge Dale, at church, at his home, his office, at Marvin Chance's place of business, and once at Goss, Mississippi, where Chancey Rogers, appellant's brother, lived. They came to see the Judge and he went to see them. It clearly appears that Judge Dale kept up with the investigation, although he did not take part in that activity. He knew the contents of a statement appellant had made to the district attorney. The judge knew of a ''plot'' on the part of all the defendants to plead not guilty and require the State to try all the defendants.

Judge Dale testified he talked to appellant's ''kinfolks—upwards of fifty times,—there was so many times, I have no recollection of it.''

In the earlier discussions between Judge Dale and appellant's kinfolks, Judge Dale repeatedly told them he could not and would not make them any promises. Judge Dale testified that they were begging him for help and he told them that out of his experiences he could tell them what to do to help themselves. Judge Dale told them appellant had signed a statement and he, Judge Dale, knew what was in it, and that appellant would be indicted for murder. Judge Dale advised them as to the legal effect of one who takes part in planning a murder. He testified further: ''If you're asking for

help out of my experience in what they got coming to them if I were in their place—and this is just what I told them—If I were in their places— in Basel's place, I'd walk up to the desk and I'd plead guilty because the Judge is not going to sentence a man to die." Judge Dale told them that "he can ingratiate himself with the people of Marion County if he'll get up there and tell the truth about it."

A few Days before court convened, the Judge went to see Marvin Chance and told Chance, "Marvin, court begins next Monday. You all been telling me you wanted help and you were going to do something. What are you going to do about it? And I said, let us know because we are going to need to know." The Judge was referring to whether appellant would plead guilty. The Judge then told Chance about the "plot" for all the defendants to plead not guilty. The Judge then said to Marvin Chance: "Now Hill (Thornhill) sucked you into it—you all going to let them get you into it again? Tell us what you're going to do." On Thursday before court convened, Judge Dale went to Goss, Mississippi, to see Chancey Rogers, appellant's brother, and said to Chancey Rogers: "Now, Chancey, this thing is coming to a showdown and you all been begging for help. I can't help you except within the frame-work of the law but I can tell you out of my experiences how you can help yourselves, and I says, And that is if he's faced with it he's going to be indicted for murder and he's going to be tried,—arraigned on a charge of murder. He's got a chance pleading guilty, he's got a chance pleading not guilty, and I said, That's up to him and if he pleads guilty I'll give him a life sentence because I am not going to sentence any man to death on a plea of guilty because I'd assume he's crazy—if he walked up and asked me to put him to death. I said, I'd just give him a life sentence. We talked on and I said, His chance if he gets life sentence—if he gets life sentence he — he

will have to serve ten years to be eligible for probation and parole. That eligibility and his getting it depends on his conduct up there. I said, Now, that's the law, but I said, You know how the people of Marion County are, they'll help you right along. If Basel and Desolee would show themselves sorry for what they've done and want to make amends for what they done and try to help for what they done, I said, It wouldn't be long before people would be helping them get out, and I said, Now, Marvin —Chancey, this is one other thing, if Basel has to go to the penitentiary we have let some of them go without waiting for the prison wagon, we've let some of them's people take them up there and carry them to prison and let them go, and I said, When they do they enter almost as a half trusty and if that comes and you all want to I'll let you all take Basel and carry him to the penitentiary or let him catch a bus—let you all pay bus fare and carry him, and that is the only thing in this world I ever mentioned about anything—any kind of help.''

On Friday before court convened on Monday, Marvin Chance told Judge Dale that appellant would not plead guilty and the Judge replied: ''Well, that's their business.'' The Judge testified that he then told Marvin Chance that some of the other prisoners were wanting to testify against appellant and that they were ''anxious to talk.'' Chance then began to beg, ''Don't let them testify against—Basel,'' and asked the Judge to give him until nine o'clock the next morning and he (Chance) would ''make them do something.'' Chance did report to the Judge the next morning that appellant would plead guilty. The Judge asked Chance if appellant was going to hire a lawyer or should he appoint one, and Chance told the Judge to appoint one. After testifying that he told Marvin Chance that the plea of guilty was without promises or ''strings'' attached, the Judge said this:

"Marvin, I want to tell you something but this is something that ought not to be mentioned perhaps and whatever you do you must not mention it to any human being, not even your wife. I says, Marvin, Willie B. McCain and Hill is going to be tried for their lives. The State is going to exact the death penalty if they can, but, I says, you know our County hasn't been bad about exacting the death penalty—there's a good chance, there is a possibility that when this thing winds up Willie B. and Hill may have life sentences too, and I said, Now if Desolee and Basel pled guilty and got life sentences and then the jury gave Willie B. and Hill life sentences, I said, We would wind up the term of court with four life sentences—two for the King Pins and two for those who had been drawn into it. I said, that is only a possibility. I said, if that were to happen, and I am saying this in confidence to you which you must not mention to your wife—if that happened I believe the district attorney and the county attorney and Mrs. Polk and the deputies would be willing for Desolee and Basel to have a manslaughter sentence. I said, I believe it and I believe they'd go along with it. I said, I don't know it and if they didn't it wouldn't be anything but whatever you do don't mention that to your wife because they'd say I made her a promise—that I'd make a promise."

Several days before court convened, Judge Dale talked to Attorney Ben Rawles and requested Rawls to accept appointment as attorney for appellant. Rawls asked the judge whether appellant would plead guilty. The Judge said "No". Rawls then told the Judge that he "would be glad to facilitate any process of legal procedure that may be required as a mere formality." Rawls reserved his answer until appointment, if necessary, so as to have an opportunity to determine if a trial would be held. Rawls told the judge he would delay acceptance until he had a conference with appellant. Rawls heard nothing further from Judge Dale until Mon-

day, June 13, 1960, after appellant had been indicted and was in court and arraignment was about to be made. Appellant was then arraigned. Rawls had never conferred with appellant. After the indictment was read, Rawls requested time to confer with appellant. This was granted and a ten or twelve minute conference was held, during which appellant gave Rawls his version and Rawls told appellant that he could not advise him on the merits of the defense because he (Rawls) had made no investigation and was neither familiar with the facts nor had any opportunity to study the charges or confer with possible witnesses. Rogers told Rawls he had discussed the matter at length with members of his family and desired to enter a plea of guilty. Rawls, who knew nothing of the more than fifty conversations between Judge Dale and members of appellant's family, then went to Judge Dale to inquire what the sentence would be if appellant pleaded guilty. Judge Dale told him the sentence would be life imprisonment. Then Rawls discussed the matter of the plea with appellant and members of appellant's family. About thirty-five minutes after Rawls was appointed, a guilty plea was entered and appellant was sentenced to life imprisonment.

Rawls testified that he doubted if he would have accepted the appointment if appellant had pleaded not guilty. He also testified that his primary concern in his discussion with appellant and the family was whether appellant realized the seriousness of the situation, "and that any decision as to a plea of guilty or not guilty would have to be made by him with him analyzing the factors involved rather than me, because I did not know the factors involved without an investigation."

On July 2, 1960, Judge Dale called appellant to the courtroom and sent for Marvin Chance and some of the other kin. Willie McCain, the actual killer, and Hillary Thornhill had been tried and given life sentences. Judge Dale then asked appellant, who had no lawyer, if he

wished to withdraw his plea of guilty to murder and enter a plea of guilty to manslaughter. Appellant said he did and the Judge, who had previously prepared an order and an agreement to that effect for appellant to sign, requested as follows: "Well, come up here and sign it now, and read what you're signing." The Judge then sentenced appellant to a seventeen-year term in the penitentiary. Appellant's brother asked the Judge if he was going to put appellant on probation. (Appellant's kin testified Judge Dale had promised probation, but the Judge denied it and the trier of facts found against appellant on this question of fact). Judge Dale said he would not put appellant on probation and had made no such promise. Judge Dale then said he had tried to help, "but if you don't want to be helped, I'll leave it just like it is." In other words, he meant the life sentence would stand.

██ ██ A defendant charged with a capital offense may plead guilty or not guilty, and the court may either accept the plea of guilty or decline the plea and put the case to trial on the merits. ██ ██ A plea of guilty will not bind the defendant unless it is entirely voluntary and made by one competent to know the consequences. ██ ██ Such plea is not voluntary if induced by fear, misapprehension, persuasion, promises, or inadvertence. ██ ██ It is the duty of the trial judge to see to it that the guilty plea is voluntary. 14 Am. Jur., Criminal Law, Sec. 270; 4 Wharton's Criminal Procedure, Sec. 1900; 22 C.J.S., Criminal Law, Section 423 (2); Dickerson v. State, 202 Miss. 804, 32 So. 2d 881. ██ ██ And in a capital case proper advice by counsel is a prerequisite to a binding plea of guilty. Sec. 2505, Miss. Code of 1942; Robinson v. State, 178 Miss. 568, 173 So. 451; 22 C.J.S., Criminal Law, Sec. 422 (4).

This case is unique because the person charged with inducing the plea of guilty with promises and persuasion is the judge who accepted the plea and whose duty it

was to see that the plea was voluntary. Because of the nature of the judicial function and the power and prestige of a circuit judge, any acts or words of his containing promises, or tending to persuade, have a much greater significance than acts or words of others.

 It is manifest from Judge Dale's own testimony that he actively engaged in persuading appellant to plead guilty and that he made promises and held out hope of lenient treatment at the penitentiary. His lawful duty was just the opposite—to see to it that a plea of guilty was voluntary. The plea was not binding on appellant.

No doubt the murder of the sheriff by the organized gangster element of the county was a grave threat to constituted authority and Judge Dale and all other officials were deeply concerned. However, the Judge was the one official who should have remained calm and impartial. While the record clearly indicates that Judge Dale did not act corruptly or from any bad motive, his actions were indiscreet and at variance with traditional standards of judicial decorum.

 The record discloses that the appointment of an attorney for appellant was a mere formality. Appellant had been charged with murder since April 27, 1960, and the attorney was not appointed until June 13, 1960, when he was before the court for arraignment. The plea of guilty was entered within thirty-five minutes after appointment of counsel. The plea of guilty was already arranged before the indictment and the attorney knew nothing of those arrangements. The attorney made it clear to appellant and his kinfolks that appellant would have to analyze the factors involved because he could not know the factors without an investigation. We said in the recent case of McKenzie v. State, 233 Miss. 216, 101 So. 2d 651, that: "The duty of the court to assign counsel to defend one accused of a capital crime who is himself unable to employ counsel was not intended

to be a mere empty formality; it means more than the mere appointment of counsel.''

It is unnecessary to discuss the effect of the absence of counsel when appellant was brought back before the Judge the second time. All that had gone before was a nullity for the reasons stated. At the second sentencing appellant had no choice, and that was made plain by Judge Dale. He gave appellant the choice of accepting the lesser sentence or the life sentence would stand.

The case is reversed, the petition for writ of error coram nobis is sustained, the judgment vacated, and cause remanded for arraignment and trial.

Reversed, petition for writ of error coram nobis sustained, and cause remanded.

All justices concur except McGehee, C.J., who was absent from the state and did not participate in conference.